**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Beer Industry Local Union No. 703 Health and Welfare Fund, *et al.*, | |
| *Plaintiffs,* | No. 22 CV 3841 |
| v. | Judge Lindsay C. Jenkins |
| Louis Glunz Beer, Inc., | |
| *Defendant.* | |

**MEMORANDUM OPINION AND ORDER**

This matter was before the court for a bench trial in December 2025. After the Plaintiffs, Beer Industry Local Union No. 703 Health and Welfare Fund and Beer Industry Local Union No. 703 Pension Fund (the Funds), rested their case, Defendant Louis Glunz Beer, Inc. made an oral Rule 52(c) motion for a directed verdict, asserting that the Funds fell short of their burden of showing that Glunz owed delinquent contributions pursuant to the parties' collective bargaining agreements. The court continued the bench trial, and, in the meantime, the parties submitted additional briefing. Upon consideration of the parties' arguments, the court grants Glunz's motion for a directed verdict.

## I.  Background

Glunz is a beer distribution company that entered into collective bargaining agreements with Beer Industry Local Union No. 703 to make contributions on behalf of its employees to the Funds, two multiemployer benefit plans. Important here, the CBAs required Glunz to pay contributions for "permanent," but not casual, employees who meet certain other threshold requirements and limits Glunz to a specific ratio of permanent-to-casual employees. Depending on the year, the CBAs provided that the number of casual employees could be no more than 30–40% of the total number of bargaining, or permanent, employees. [Dkts. 73-4, 73-5, 73-6.][1] To ensure compliance with the terms of the agreements, the Funds ordered an audit of Glunz for the period of January 1, 2017 through December 31, 2019. [Dkt. 73-3.] Based on the results of that audit, the Funds filed suit against Glunz seeking to recover alleged delinquent contributions. [Dkts. 1, 31.]

The parties eventually filed cross-motions for summary judgment. [Dkts. 71, 74.] To demonstrate Glunz's delinquent contributions, the Funds relied on two

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

documents created by their auditor, James Sanew. First, Sanew's original audit report, conducted in October 2020, indicated that Glunz misclassified several employees as casual when the employees, based on their job duties, should have been classified as permanent. [Dkt. 76-2 at 227–48.] And a few months after completing his audit report, Sanew created a chart based on the permanent-to-casual ratio designated in the CBAs. [Dkt. 73-2 at 13–14.] This ratio chart displayed two columns, one for casual employees and one for permanent employees. [Dkt. 76-11 at 88.] Sanew highlighted several employees in the casual column that exceeded the number of casual employees allowed under the CBAs. [*Id.*]

The court denied both motions, concluding that neither party had established no genuine dispute of material fact as to whether Glunz owed delinquent contributions. [Dkt. 90 at 9.] While the court acknowledged that exceeding the ratio could convert an otherwise casual employee into a permanent employee for contribution purposes, Sanew's audit and chart contained no analysis and Glunz disagreed with his classifications. [*Id.* at 6.] "Who to believe," the court continued, "is for the factfinder to decide." [*Id.*]

The court held a bench trial in December 2025. [Dkts. 124–126.] At trial, the Funds abandoned the theory that Glunz owed contributions for misclassifying employees based on the employee's job duties and instead proceeded only on the ratio theory—that Glunz classified too many employees as casual. [Dkt. 125 at 54–56, 63.] In support of the ratio theory, the Funds had Sanew take the stand and explain his ratio chart, submitted as Pls. Exhibit 2.[2] [Dkt. 124 at 85-86.] Sanew explained that he chose which individuals to highlight based on his original audit, highlighting the employees he designated as working in a permanent role based on their job duties. [Dkt. 124 at 104–05; Dkt. 125 at 290.] And he represented that each highlighted employee had worked at least 11 days each month (a requirement to trigger contributions). [Dkt. 124 at 107.] But he presented conflicting testimony about whether he included a probationary period for each highlighted employee (another requirement for contributions). [*Id.* at 171–87.]

The Funds also presented two other witnesses at trial. Michael Tevino, a Glunz Human Resources employee, explained how remittance reports, which Glunz receives from the Union and then verifies, list all employees classified as permanent and indicate whether each employee receives pension and/or health and welfare benefits. [Dkt. 125 at 6–29.] He also testified that, while most employees elect to receive health and welfare benefits, several employees highlighted in Sanew's ratio chart elected not to receive health and welfare benefits once they were officially designated as permanent. [*Id.* at 235–36, 242.] Sherryl Reeves, the Funds' administrator, also testified about the remittance report, explaining the Funds' process for reviewing the report and, when necessary, their process for collecting delinquent contributions from

---

[2]     This exhibit can also be found at Dkt. 76-11 at 88–123.

participating employers. [Dkt. 124 at 33–37.] And she testified that almost all employees eligible for health and welfare benefits opt to receive them. [*Id.* at 39.]

Once the Funds rested, the court, along with Glunz, expressed concern about whether the Funds provided sufficient evidence and explanation for the court to assess liability and damages. [Dkt. 126 at 25–27.] So the court continued the bench trial and permitted the Funds to submit additional materials clarifying its alleged damages based on the trial record. [Dkt. 126 at 43–44.] About a week later, the Funds submitted a New Chart.[3] [Dkts. 131, 132.] The New Chart purports to offer a month-by-month, employee-by-employee analysis of contributions owed to each fund. Notably, the calculations in the Funds' New Chart do not rely on and are not consistent with Sanew's audit or ratio chart.

## II.   Findings of Fact and Conclusions of Law

Under Federal Rule of Civil Procedure 52(c), a district court conducting a bench trial may, after weighing the evidence and determining witness credibility, issue a directed verdict once a party is fully heard on an issue. Fed. R. Civ. Pro. 52(c). *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 748 (7th Cir. 2020). The court's findings of fact and conclusions of law must comply with Rule 52(a)'s requirement that the court "find the facts specially and state its conclusions of law separately." *Id.* at 478; See Fed. R. Civ. P. 52(c).

After the Funds rested their case, Glunz moved for a directed verdict under Rule 52(c), asserting that the Funds failed to show that Glunz owed contributions pursuant to the parties' CBAs.

Three agreements govern the parties' dispute: (1) the 2008–2012 CBA, (2) the 2012 Memorandum of Agreement modifying the 2008–2012 CBA and in effect until January 2018, and (3) the 2018–2023 CBA.

Relevant here, the 2008–2012 CBA described "summer employees (employees employed between the dates of May 1 through September 15) and casual employees who may be employed on a day-to-day basis" as "temporary employees," and provided that the "number of casual employees shall be no more than 40% at anytime." [Dkt. 73-4 at 16-7.] "The 40% number will be based on the total number of bargaining unit employees employed by the company." [*Id.*] The CBA defined permanent employees, on the other hand, as "employees who have a permanent job assignment and who are a part of the total complement of classified personnel within a distribution center of a present Employer." [*Id.* at 14.]

---

[3]   The Funds submitted two documents, a "Damages Summary" and "Appendices to Plaintiffs' Damages." Unless otherwise specified, when the court refers to the New Chart, it is referring to both these documents.

Under the 2008–2012 CBA, Glunz agreed to pay a specified amount ($555 effective February 1, 2012) to a Health and Welfare Fund for each permanent employee who works 11 or more workdays during the calendar month after the employee's completion of their probationary period (which spans 60 workdays). [*Id.* at 14, 35.] Glunz was not required to make contributions for summer or casual employees, however. [*Id.* at 38.] Glunz was also required to make contributions ($238 beginning February 1, 2012) to a Pension Fund for each permanent employee who works 11 or more days during a calendar month after completing the probationary period. [*Id.*] Again, it owed no contributions for temporary employees. [*Id.* at 40.]

The Memorandum of Agreement extended the 2008–2012 CBA for six years with several modifications. As relevant here, the Agreement adjusted the casual-to-permanent employee ratio from 40% to 35%. [Dkt. 73-5 at 2.] It also explained that Glunz only needed to make Health and Welfare contributions for employees who elect to receive coverage. [*Id.*] The 2018–2023 CBA, for its part, returned the casual-to-permanent employee ratio to 40% and increased the Pension Fund contribution from $238 per covered employee to $556 per covered employee with additional increases of $12 per year. [Dkt. 73-6 at 10, 25.]

During trial, the Funds explained that they were proceeding only on their theory that Glunz exceeded the casual-to-permanent employee ratio. [Dkt. 125 at 54–56, 63.] In their view, if Glunz exceeded the ratio by classifying too many employees as casual, each casual employee that exceeded the ratio qualifies as a permanent employee for contribution purposes. This theory, as the court explained at summary judgment, has weight. [Dkt. 90 at 9, n.6]; see *Cent. States, Se., Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 914 (7th Cir. 2000) ("[B]ecause the employees were not truly casuals, they had to have been probationary employees, the only other type of new employee countenanced by the CBA."); see also *Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. Stromberg Metal Works, Inc.*, 118 F.4th 621, 636 (4th Cir. 2024) (allowing benefit fund to use ratio designated in a CBA as a proxy for amount of contributions owed by employer based on employer's misclassifications).

The problem with the Funds' case, however, is they failed to demonstrate that the misclassified permanent employees met the other requirements for contributions.[4] That is, to establish that Glunz owed additional contributions to the Welfare and Pension Funds, the Funds had to show that each casual employee who exceeded the ratio, and by extension, was considered permanent for contribution purposes also (1) completed their 60 workday probationary period; (2) worked more

---

[4] In opposing Glunz's motion, the Funds mischaracterize the court's summary judgment holding. [Dkt. 129 at 6.] The court did not rule that the CBAs mandate contributions for each employee that exceeded the ratio. It held only that each casual employee that exceeded the ratio must be deemed permanent for contribution purposes. That holding does not alleviate the Funds of their burden to show that each employee met all other requirements for contributions.

than 11 days in the relevant calendar month; and (3) elected coverage (for Health and Welfare Fund only). The court concludes that the Funds fell short of this burden.

At trial, the Funds relied on Sanew's testimony, along with his original audit report from 2020[5] and ratio chart, to prove the amount of Glunz's delinquent contributions. But Sanew's testimony was incredible. For starters, as the Funds conceded, Sanew included one employee in the casual column of his ratio chart for three months before the employee began working for Glunz. [Dkt. 125 at 261.] He also conflated summer and casual employees and failed to recalculate the ratio each time an employee moved from the casual column to the permanent column. [Dkt. 124 at 162.]

Further, when Glunz pressed Sanew on whether each employee he selected from the casual column had worked the required 60 workday probationary period, Sanew confirmed that each had. [*Id.* at 171–72.] Yet Sanew could not explain how he came to that conclusion and, as it turns out, at least one employee Sanew selected could not have completed a probationary period because he was not a Glunz employee during the applicable months. [*Id.* at 174–87.] Indeed, it appears that the underlying records Sanew relied on did not span a time frame sufficient to even assess whether each employee completed the required probationary period. To say the least, the court has little confidence in Sanew's conclusions.

Surely recognizing the weaknesses in Sanew's testimony, the Funds have shifted gears in response to Glunz's Rule 52(c) motion, now urging the court to adopt the conclusions in their New Chart. [Dkt. 129.] But instead of defending and providing additional support for Sanew's findings, the Funds' New Chart starts from scratch and, using Glunz's employment records, identifies the employees they believe Glunz owes contributions for based on the CBAs' permanent-to-casual ratio. [Dkt. 129 at 9 (explaining the methodology for creating the Appendices to Plaintiffs' Damages).]

The mismatch between the contributions sought in Sanew's ratio chart and those sought in the New Chart is evident. Take the New Chart's December 2017 assessment, for example. While three of the employees Sanew highlighted for delinquent contributions are also selected for contributions in the New Chart, one employee Sanew highlighted (Anthony Espinoza) is not, and the New Chart selects an additional three employees that Sanew did not highlight (Richard Baker, Kevin Doyle, Jorge Maxinez). [*Compare* Dkt. 132 at 24 *with* Dkt. 76-11 at 99.] So Sanew's chart concluded that Glunz owes contributions for four employees in December 2017 while the New Chart says it owes contributions for six. The New Chart, moreover,

---

[5]     At trial, Glunz moved to strike Sanew's original audit report, admitted as Joint Exhibit 10, which the court granted. [Dkt. 126 at 3, 8.] Accordingly, this Order discusses the information described in Sanew's ratio chart, Pls. Ex. 2 / Dkt. 76-11, which was admitted over Glunz's objection. [Dkt. 124 at 104.]

gives different reasons for its designations; Sanew testified that he chose which casuals to move to the permanent column based on their job duties; the New Chart, on the other hand, made the decision based on other factors such as number of days worked.

The New Chart also indicates that it relies on several assumptions and record documents that Sanew did not include in his chart or testify about. In December 2017, for instance, the New Chart indicates that two employees included in the casual column were not on Glunz's payroll. [Dkt. 132 at 23 (Kevin Doyle and Liam Keane).] And in July 2018, the New Chart states that two employees listed in the permanent column were not on Glunz's payroll or included in the daily logs. [Dkt. 132 at 37 (John Glunz, Jr. and Tom Orzeszek).] These are but a few examples, there are others. [6]

All this to say: the Funds' New Chart presents different grounds for damages than Sanew's ratio chart. And unfortunately for the Funds, they presented this new theory too late. By "shift[ing] [their] focus at the eleventh hour" in something akin to a "bait-and-switch maneuver," the Funds arguments offered in their New Chart are estopped or waived. *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 666–67 (7th Cir. 2016) (in trademark dispute, district court abused its discretion by allowing plaintiff to raise a new continuous use argument for the first time in a post-trial filing, noting that defendant was entitled to rely on plaintiff's continuous use theory as plaintiff had described it numerous times in pretrial filings).

That is, from the very beginning of this case through their presentation at trial, the Funds pursued contributions from Glunz based on Sanew's audit and ratio chart. Sarting with their amended complaint, the Funds alleged that the "findings of [Sanew's audit]" showed "the existence of unpaid contributions" and sought to recover the delinquent contributions "found due and owing by the audit." [Dkt. 31 at 3, 7.] Fast forward to summary judgment, the Funds explained that "deficiencies found by [Sanew's] audit form the basis of [its] claims" and argued that no genuine dispute of material fact exists "[i]f the report of the auditor is correct." [Dkt. 75 at 5–6; see dkt. 76, ¶¶ 49, 58 – 59, 63–66, 75 (Funds' Rule 56.1(a)(2) statement explaining that Sanew's audit "forms the basis or Plaintiffs' claim" for contributions and identifying the specific amount of contributions Sanew deemed delinquent and owed based on his audit and ratio chart).] In the proposed pretrial order, too, the Funds represented

---

[6]      Even if the court allowed the Funds to proceed on their new theory, the New Chart is not persuasive. On a cursory review, several errors and inconsistencies stick out, undermining its conclusions. First, despite the Funds' admission that Ben Kelly-Esmaili began employment with Glunz in April 2017, the Funds begin allocating contributions on his behalf in April 2017, failing to account at all for a probationary period. The chart also seems to omit a probationary period for Angel Guadarrama, John Nettles, and Guillermo Rivera, Jr. And while it is uncontested that several employees opted out of health and welfare benefits once Glunz classified them as permanent, the chart, without explanation, assumes that those employees would have opted in to the same benefits during the time Glunz labeled them as casual.

that they sought "contributions alleged as owing pursuant to an audit of Defendant's books and records." [Dkt. 114 at 3; *id.* at 11 (explaining that the Funds seek "contributions that Sanew's audit report asserts are owing").] To no one's surprise, then, the Funds' entire trial presentation focused on Sanew and his findings.

In a nutshell, for over three years, the Funds hinged Glunz's liability and damages on Sanew's audit and ratio chart, which listed, month-by-month, employee-by-employee, contributions owed by Glunz. Glunz litigated, prepared its case, and considered settlement opportunities accordingly. *Cf Bergstrom, Inc. v. Siemens Elec., Ltd.*, 208 F.R.D. 234, 236 (N.D. Ill. 2002) (observing that one reason for holding a party to their original theories is that parties base settlement decisions on the opposing party's offered theory of the case). Now, *after resting their case*, the Funds tell the court and Glunz to pay no mind to the years they spent defending and referring to Sanew's audit and ratio chart.

That won't do. The prejudice in allowing the Funds to move forward on a new theory this late in the game is apparent. As one example of that prejudice, the joint exhibits presented as part of the trial record include payroll journals and daily logs starting in January 2017. But under the Funds' new theory, Glunz would, at least for some employees, need records prior to January 2017 to determine whether the employee completed the required probationary period. Glunz has also represented that its decision to submit certain joint exhibits was based on the Funds' original theory of damages. [Dkt. 130 at 2, n.2.]

Recall also that the New Chart relies on several assumptions that Glunz has had no chance to challenge. Indeed, in its Rule 52(c) briefing, Glunz highlights several of those challenges, including why contributions are sought for several employees before any identified probationary period, why July 2017 has no "corrected" columns, and why certain employees were selected for permanent status over others. [Dkt. 130 at 4–6 (listing nineteen topics Glunz would have explored on cross-examination had it known of the Funds' new damages theory earlier in the litigation).]

In the end, Glunz was entitled to rely on the Funds' repeated representations that they would pursue the specific damages outlined in Sanew's audit and ratio chart. The Funds do not get "a second chance to present a more reasonable theory." *Roberts v. Astrue*, 2009 WL 382536, at *3 (S.D. Ind. Feb. 12, 2009); *Harper v. Albert*, 400 F.3d 1052, 1063 (7th Cir. 2005) ("[T]his court has consistently enforced a strict rule of forfeiture in a situation where a party seeks to introduce a new legal theory to the litigation after the pretrial order has issued."); *S.C. Johnson & Son, Inc.*, 835 F.3d at 668 (reversing district court's decision to allow party to proceed on new theory offered for first time in post-trial briefing).

### III. Conclusion

Because the Funds failed to offer persuasive evidence that Sanew's ratio chart and accompanying testimony established that Glunz owed contributions pursuant to the CBAs, the court grants judgment in favor of Glunz.

Enter: 22-cv-3841
Date:   April 15, 2026

_____
Lindsay C. Jenkins